UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| NORTHEASTERN RURAL ELECTRIC MEMBERSHIP CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | 1:12-cv-144-SEB-DML |
| WABASH VALLEY POWER ASSOCIATION, INC., | ) ) ) | |
| Defendant. | ) | |

**ORDER DENYING PLAINTIFF'S MOTION TO REMAND AND GRANTING DEFENDANT'S MOTION FOR PRELIMINARY INJUNCTION**

This cause is before the Court on Defendant's Motion for Temporary Restraining Order and Preliminary Injunction [Docket No. 15], filed on February 2, 2012, and Plaintiff's Motion to Remand [Docket No. 31], filed on March 7, 2012. Plaintiff, Northeastern Rural Electric Membership Corporation ("NREMC"), brought the underlying declaratory judgment action seeking a declaration that Defendant, Wabash Valley Power Association, Inc. ("Wabash Valley"), materially breached the parties' wholesale power supply contract and further that Plaintiff has no duty to continue to purchase its wholesale electric power requirements from Defendant. Wabash Valley seeks a preliminary injunction barring NREMC from unilaterally terminating its obligation to buy all of its power from Wabash Valley during the pendency of this litigation at the filed rate approved by the Federal Energy Regulatory Commission

("FERC"). For the reasons detailed in this entry, we <u>DENY</u> Plaintiff's Motion to Remand and <u>GRANT</u> Defendant's Motion for Preliminary Injunction.

**Factual Background**

Wabash Valley is a generation and transmission cooperative formed in 1963 to provide wholesale power and transmission service to its members for resale to their retail customers. Since 1977, NREMC, a member of the Wabash Valley cooperative, has purchased its entire power requirements from Wabash Valley under the parties' wholesale power supply contract ("the 1977 contract").

Prior to July 1, 2004, Wabash Valley had outstanding debt financing with the United States Department of Agriculture's Rural Utilities Service ("RUS"), and thus, was not a "public utility" under Section 201(e) of the Federal Power Act ("FPA'), 16 U.S.C. § 824e. Because Wabash Valley was not a public utility, FERC did not have jurisdiction to regulate Wabash Valley's rates for wholesale power sales and transmission service to its members and Wabash Valley's rates were instead regulated by the Indiana and Michigan Commissions to FERC. However, on April 7, 2004, the Wabash Valley Board of Directors voted to approve a resolution to repay its remaining RUS debt, an action which had the effect of transferring rate regulation from the state commissions to FERC.

NREMC was one of three Wabash Valley member cooperatives that voted against the resolution, arguing that the switch to FERC regulation would violate the terms of the 1977 contract. Specifically, NREMC alleges that the transfer violated Paragraph 4 of the all-requirements contract, which provides as follows:

2

RATE. Subject to the approval of the Public Service Commission of Indiana:

    (a)    The members shall pay WVPA for all electric power and energy furnished hereunder at rates and on the terms and conditions set forth in the applicable rate schedule;

    (b)    The Board of Directors of WVPA at such intervals as it deems appropriate, but in any event not less frequently than once in each calendar year, shall review the rate for electric power and energy furnished hereunder and under similar agreements with other members and, if necessary, shall revise such rates so that it shall produce revenues which shall be sufficient, but only sufficient, with the revenues of WVPA from all other sources, to meet the cost of operation and maintenance of the generating plant(s) transmission system and related facilities, the cost of power and energy purchased for resale hereunder by WVPA, pay applicable taxes, make payments on account of principal and interest on all indebtedness of WVPA, and to provide for the establishment and maintenance of reasonable reserves. WVPA shall cause a notice in writing to be given to the Member and other Members which shall set out all of the proposed revisions of the rate with the effective date thereof, which shall be not less than thirty (30) days nor more than forty-five (45) days after the date of such notice, and shall set forth the basis upon which the rate is proposed to be adjusted and/or established. The Member agrees that the rate, from time to time, established by the Board of Directors of WVPA shall be deemed to be substituted for the rate herein provided and agrees to pay for electric power and energy furnished by WVPA to it hereunder after the effective date of any such revision at such revised rates; provided, however, that no such revision shall be effective unless approved by applicable regulatory authorities and the Administrator.

Docket No. 16-5.

After the resolution passed, on April 30, 2004, Wabash Valley filed with FERC its proposed Formula Rate Tariff and its all-requirement power supply contracts as WVPA Rate Schedule FERC No. 27. On June 29, 2004, FERC issued an order: (1) accepting for filing the WVPA Formula Rate Tariff and the related 1977 contract with NREMC as part of the NREMC FERC Rate Schedule; and (2) exercising exclusive jurisdiction over the rates and terms and conditions of the wholesale electric and transmission service that Wabash Valley provides to its members. See Wabash Valley Power Assoc., Inc., 107 FERC ¶ 61,327, at 62,506 (2004).

After Wabash Valley became a FERC jurisdictional utility on July 1, 2004, NREMC decided to exercise its option to buyout its power supply contract (which was to continue until 2028) and terminate its membership in Wabash Valley. The buyout agreement was memorialized in the July 1, 2005 Sixth Supplemental Agreement to NREMC's 1977 wholesale power supply contract with Wabash Valley. Pursuant to that agreement, NREMC would continue to buy all-requirements power from Wabash Valley and "[the 1977 contract], as amended, shall continue in full force and effect for a period of (10) years, to and including June 30, 2015, at which time the [1977 contract] shall terminate." Docket No. 16-14. The Sixth Supplemental Agreement further provides as follows:

> 11. Specific Performance Available. The Member agrees that the failure or threatened failure of the Member to comply with the terms of this Agreement will cause irreparable injury to Wabash Valley which cannot properly or adequately be compensated by the mere payment of money. Therefore, the Member agrees that, in the event of a breach or threatened

> breach of the terms of the Agreement by the Member, Wabash Valley shall
> have the right, in addition to any other remedies that may be available
> judicially, to obtain from any competent court a decree enjoining such
> breach or threatened breach of the terms of this Agreement or a decree
> providing that the terms of this Agreement be specifically enforced.

Id.

At all times since the transfer to FERC regulation became effective on July 1, 2004, NREMC has paid the FERC-approved rate for its power purchases from Wabash Valley. However, in a letter dated December 27, 2010, NREMC for the first time demanded that Wabash Valley restore rate regulation of its power sales to NREMC to the Indiana Commission. The letter further provided that if Wabash Valley was unwilling or unable to do so, NREMC was entitled to cancel its obligations to continue to purchase power from Wabash Valley based upon Wabash Valley's repudiation and material breach of the 1977 contract. After failed negotiations, Wabash Valley sought a declaratory order at FERC. On November 21, 2011, FERC granted the petition, holding that it has exclusive jurisdiction over the WVPA Formula Rate Tariff and NREMC Rate Schedule and that it is the applicable regulatory authority under the 1977 contract. It did not reach NREMC's breach of contract claim, however, rejecting the claim as beyond the scope of the proceeding.

On January 5, 2012, NREMC sent Wabash Valley a Notice to Terminate, which sets forth NREMC's declaration that the 1977 contract is cancelled as of the end of February 2012. That same day, NREMC filed in the Marion Superior Court its complaint for a declaratory judgment, seeking a declaration that it has no further obligation to

5

purchase power from Wabash Valley. On February 1, 2012, Wabash Valley removed the case to this court, asserting federal question jurisdiction.

## **Legal Analysis**

### I. Standard of Review

A grant of injunctive relief is appropriate if the moving party is able to demonstrate: (1) a reasonable likelihood of succeeding on the merits; (2) irreparable harm if preliminary relief is denied; and (3) an inadequate remedy at law. Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc., 549 F.3d 1079, 1086 (7th Cir. 2008). If the moving party fails to demonstrate any one of the three threshold requirements, the emergency relief must be denied. Id. However, if these threshold conditions are met, the Court must then undertake to assess the balance of harms – here, the harm to Defendant if the injunction is not issued against the harm to Plaintiff if it is issued – and, where appropriate, also determine what effect the granting or denying of the injunction would have on nonparties (the public interest). Id.

In determining whether to grant injunctive relief, the district court must take into account all four of these factors and then "exercise its discretion 'to arrive at a decision based on the subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case." Id. (quoting Lawson Prods., Inc. v. Avnet, Inc., 782 F.2d 1429, 1436 (7th Cir. 1986)). This process involves engaging in what is often referred to as the "sliding scale" approach, meaning that "the more likely it is the [party seeking the injunction] will succeed on the merits, the less balance of irreparable

harms need weigh toward its side; the less likely it is the [party seeking the injunction] will succeed, the more the balance need weigh towards its side." Abbott Laboratories v. Mead Johnson & Co., 971 F.2d 6, 12 (7th Cir. 1992). "The sliding scale approach is not mathematical in nature, rather 'it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief.'" Ty, Inc. v. Jones Group, Inc., 237 F.3d 891, 895-96 (7th Cir. 2001) (quoting Abbott Laboratories, 971 F.2d at 12).

## II.  Discussion

### A.  Likelihood of Success on the Merits

After hearing oral argument and reviewing the parties' submissions, we are persuaded that, although styled as a breach of contract action, at its heart, this is a case about rates. NREMC wants to receive a preferential rate from Wabash Valley, but under Wabash Valley's FERC-filed tariff, each of its members must pay the same rate. NREMC does not dispute the fact that, under the filed rate doctrine, a utility like Wabash Valley, whose rates are on file with FERC, may not deviate from the filed rate. Consequently, as long as NREMC is bound by a FERC-approved rate schedule, it cannot receive a preferential rate or any rate lower than the filed rate without first pursuing a complaint with FERC. Rather than directly challenging the rate with FERC, NREMC has instead brought this action, alleging that Wabash Valley's switch from state to FERC rate regulation in 2004 constituted a material breach of the parties' 1977 wholesale power supply contract, and seeking a declaration that it has no continuing duty to purchase its

7

wholesale power requirements under the contract, thereby leaving it free to leverage a preferential rate from Wabash Valley that is not governed by FERC.[1] For the reasons detailed below, we are persuaded that Wabash Valley has shown at this stage of the litigation that it has a strong likelihood of success on the merits of NREMC's claim.

NREMC is seeking to prevail on a breach of contract claim based on a contract formed in 1977. However, that claim can succeed only if we ignore the intervening events in which Plaintiff has uniformly and entirely acquiesced, beginning with the switch to FERC regulation in 2004. Although NREMC objected in 2004 to the decision of the board of Wabash Valley to repay its RUS loan, which had the effect of transferring rate regulation by the Indiana and Michigan Commissions to FERC, it chose not to bring an action for breach at that time after it was outvoted by the other members of the cooperative. If NREMC ever had such a claim, it was ripe at that point, when Wabash Valley first became a FERC jurisdictional utility engaging in the FERC-regulated sale of power for resale to its members, including Plaintiff. However, NREMC did not file an action for breach of contract when the transfer occurred nor has it ever initiated a complaint or other proceeding before FERC to challenge any aspect of the FERC-

---

[1] As discussed above, Plaintiff's claim, while styled as a state law breach of contract claim, is actually a collateral attack on the FERC-filed rate. Federal courts have exclusive jurisdiction of violations of the FPA or the "rules, regulations and orders thereunder" and of suits to enforce any liability or duty created by the FPA or any "rule, regulation, or order thereunder." 16 U.S.C. § 825p. Federal tariffs, like the FERC-filed WVPA Tariff and NREMC Rate Schedule, are the equivalent of federal regulations. Cahnmann v. Sprint Corp., 133 F.3d 484, 488 (7th Cir. 1998). Therefore, the parties' dispute clearly raises questions of federal law. Thus, we find that federal subject matter jurisdiction exists and the action was properly removed. Accordingly, Plaintiff's Motion to Remand is DENIED.

approved Formula Rate Tariff and related rate schedules.

To the contrary, since 2004, NREMC has continued to purchase its entire power requirements from Wabash Valley pursuant to its obligations under the 1977 contract at the FERC-approved rate. Not only has NREMC consistently paid the FERC-approved rate since FERC took over jurisdiction, but approximately one year after the transfer occurred, in exercising the option provided by Wabash Valley for a buyout of the 1977 contract, NREMC executed the Sixth Supplemental Agreement to the 1977 contract, which reaffirmed its all-requirements power purchase commitment through June 30, 2015. The Sixth Supplemental Agreement provides that the 1977 contract otherwise remains in "full force and effect," which clearly contradicts NREMC's contention that the 1977 contract was materially breached the year before by the transfer to FERC jurisdiction. NREMC has subsequently signed three additional supplements, the most recent on June 2, 2010, six months before it filed its breach of contract claim, all of which contain that same provision. In light of these actions, it is likely that Wabash Valley will be able to establish that any modification of the 1977 contract caused by the transfer to FERC jurisdiction was ratified by NREMC as a result of its conduct.

Moreover, FERC has twice issued orders holding that Section 4 of the 1977 contract permitted the 2004 filing of that contract as a FERC rate schedule. Most recently, in 2011, FERC granted Wabash Valley's petition for a declaratory order, finding that FERC has had exclusive jurisdiction over Wabash Valley's tariff and its all-requirements contract with NREMC since 2004 and that FERC, not a state regulatory

commission, is the "applicable regulatory authority" referenced in Section 4 whose approval must be sought before rate revisions can be effective. In making this ruling, FERC essentially rejected the contract construction upon which NREMC relies to support its breach of contract claim in the instant cause of action.

FERC reached a similar conclusion in 2004 when an argument analogous to that relied upon by Plaintiff in this litigation was put forth by Midwest Energy Cooperative, another member of the Wabash Valley cooperative who objected to the transfer of rate regulation to FERC and intervened in the 2004 FERC proceeding to protest Wabash Valley's filing with FERC of the 1977 contract. Citing the same section of the parties' 1977 contract that is at issue in the instant litigation, Midwest noted that section 4(b) provides that rate revisions could be proposed by the Wabash Valley Board of Directors, but that "no such revisions shall be effective *unless approved by the applicable regulatory authorities*." (emphasis added). Midwest maintained that the 1977 contract provided that the Indiana Commission was initially the applicable regulatory authority, and then, on June 26, 1986, jurisdiction over the contract was assumed by the Michigan Public Service Commission. Thus, Midwest argued that it should not be bound by a FERC-approved rate because, under the terms of the contract, Wabash Valley was required to seek approval, not from FERC, but from the Michigan Commission before it revised rates. FERC rejected Midwest's argument, however, holding in pertinent part as follows:

> 12. The language of the 1977 Contract, that rate changes not take effect

> unless approved by the applicable regulatory authorities, similarly does not preclude application of the proposed Formula Rate Tariff to Midwest under that contract. As of July 1, 2004, the proposed effective date, this Commission will exercise exclusive jurisdiction over the rates, terms and conditions of wholesale electric service and transmission in interstate commerce provided by Wabash Valley, not the Michigan Commission (i.e., this Commission will be the applicable regulatory authority under the contract, not the Michigan Commission).

107 FERC ¶ 61,327, at 62,506.

NREMC did not seek judicial review of FERC's 2011 jurisdictional ruling nor did it seek to intervene or request a rehearing of FERC's 2004 order rejecting Midwest's objections to FERC's rate jurisdiction based on Section 4 of the 1977 contract, despite the fact that at that time NREMC was also a member of the Wabash Valley cooperative and party to a contract which used the same language as Midwest's contract. Section 313 of the FPA provides the exclusive means for obtaining judicial review of FERC's orders and requires that an application for rehearing be filed with FERC before judicial review may be sought. Because NREMC failed to follow the procedures required to challenge these rulings, it is bound by the findings made therein and cannot now collaterally attack FERC's determination that, when Wabash Valley paid off its RUS loan and transferred to FERC regulation, FERC moved into the shoes of the state regulatory commissions and became the applicable regulatory authority referenced in Section 4 of the 1977 contract.

In light of these FERC rulings and NREMC's own acquiescence since 2004, we find that Wabash Valley has demonstrated a strong likelihood of success in opposing NREMC's claim for a declaratory judgment that Wabash Valley breached the parties'

11

1977 contract by transferring to FERC regulation.

B.     **Irreparable Harm and Inadequate Remedy at Law**

Wabash Valley has presented evidence that, absent an injunction requiring NREMC to continue to purchase all of its power requirements from Wabash Valley at the FERC-filed rate, it will suffer irreparable harm for which there is no adequate remedy at law. Although the parties dispute the direct financial damage that Wabash Valley is likely to suffer if the injunction does not issue, NREMC concedes that the decrease in revenue would be at least $500,000 per month.[2] Wabash Valley has presented evidence establishing that a shortfall in revenues of that amount will likely deplete its cash reserves to such a level that it would be required to borrow more from its line of credit, which could result not only in an increase in its financing costs, but also in damage to its credit rating as lenders and credit rating agencies measure Wabash Valley's financial stability and creditworthiness by its wholesale power contracts with its members. The financial consequences ultimately stemming from a credit downgrade and/or increased financing costs are difficult to measure.

A reduced credit rating is also likely to have more than purely financial consequences for Wabash Valley. Wabash Valley has presented evidence establishing

---

[2] Wabash Valley contends that if NREMC ceases its all-requirements power purchases, the financial damage will amount to an average of more than $2 million per month. NREMC rejoins that it has offered to mitigate those damages, agreeing to continue purchasing its power from Wabash Valley at 90% of the current FERC-filed rate, which would result in a decrease in revenue of somewhere between $500,000 (NREMC's estimate) and $642,000 (Wabash Valley's estimate) per month.

that in order to enter into the power purchase agreements that are required to secure wholesale power for its members, it must be able to exhibit credit strength. A diminished credit rating would likely limit the group of potential power suppliers willing to deal with Wabash Valley, thereby creating a risk that its members would be forced to incur increased power supply costs. The harm to Wabash Valley's credit and the increased costs to its members would likely in turn damage its goodwill in the industry, adversely affecting its ability to secure advantageous power supply and transmission transactions, obtain favorable financing, and attract new members. Coons Aff. ¶¶ 35-37; Conrad Aff. ¶¶ 21-24.

Moreover, as other courts have recognized, the all-requirements power supply contracts between generation and transmission cooperative like Wabash Valley and their member distribution cooperatives are unique because they "are not simple requirements contracts but rather interdependent, joint and mutual contracts...." Tri-State Generation and Transmission Ass'n v. Shoshone River Power, Inc., 874 F.2d 1346, 1359 (10th Cir. 1989). For Wabash Valley, this means that, in order to ensure it has the power supply resources to provide reliable all-requirements power to each of its members, it has invested in generating capacity based on all of its members' combined long-term purchase commitments. Consequently, NREMC's termination of its power purchases in advance of its current 2015 buyout date would result in a glut of power supplies that could translate to stranded costs and fluctuating energy prices for Wabash Valley's remaining members, likely further damaging its goodwill in the industry.

13

Wabash Valley has demonstrated that, without the requested injunctive relief, it will suffer significant financial losses that are not easily measured or compensated as well as non-monetary harm, including a likelihood of damage to its credit rating and goodwill that cannot be adequately compensated by money damages. The Seventh Circuit has held that such harms are "both real and irreparable." Girl Scouts of Manitou Council, 549 F.3d at 1090. Additionally, we note that NREMC itself agreed in the Sixth Supplemental Agreement that, in light of the uncertain costs to Wabash Valley that would result from Plaintiff's failure to perform, an actual or "threatened" breach of its obligations under that Agreement would cause Wabash Valley to suffer irreparable injury and entitle Wabash Valley to specific performance of NREMC's obligations through injunctive relief.[3] Docket No. 16-14. For these reasons, we find that Wabash Valley has met its burden to establish that it will face irreparable harm for which there is no adequate remedy at law if NREMC is allowed on April 1, 2012 to cease purchasing power from Wabash Valley at a rate lower than the current FERC-filed rate.

### C. Balance of the Harms

As discussed above, Wabash Valley has presented convincing evidence that it will likely suffer significant financial harm as well as damage to its credit rating and goodwill

---

[3] NREMC contends that this provision is irrelevant because Wabash Valley breached the 1977 contract by transferring to FERC regulation, and thus, NREMC is not obligated to abide by the terms of the Sixth Supplemental Agreement. However, for the reasons discussed above, we have determined it to be unlikely that NREMC will be able to succeed on the merits of its breach of contract claim, and thus, if it unilaterally stopped purchasing its power requirements from Wabash Valley before the June 30, 2015 end-date specified in the Sixth Supplemental Agreement, it would be in breach of its obligations under that contract.

in the marketplace if injunctive relief does not issue. The harm NREMC will suffer if the injunction does issue, on the other hand, is purely financial, to wit, the 10% difference between the lesser rate NREMC has offered to pay to mitigate Wabash Valley's potential damages (to wit, 90% of the FERC-filed rate) and the full FERC-filed rate.

NREMC contends that if the injunction issues, but NREMC ultimately prevails on its argument that its unilateral termination of the 1977 contract as of March 1, 2012 was valid, then it would be unable to recover the amount it overpaid Wabash Valley after March 1 because such recoveries are prohibited by the filed rate doctrine. However, if NREMC prevails on its arguments that its termination of the 1977 contract is not within FERC's jurisdiction, then it would follow that NREMC's purchases and payments after March 1 would also be outside of FERC's jurisdiction. NREMC does not contend, nor is there evidence in the record that would lead us to conclude that Wabash Valley would be unable to make NREMC whole through a monetary payment in such an instance if that were required. Accordingly, because we find that NREMC is not at risk of irreparable injury if Wabash Valley's motion for a preliminary injunction is granted, the balance of harms weighs in favor of Wabash Valley.

D.  **Public Interest**

Because we have found that Wabash Valley has demonstrated a likelihood of success on the merits, the public interest also supports the issuance of the injunction it requests. Many communities depend on cooperatives like Wabash Valley for their energy supply. In order to pay for their long-term power purchase commitments, those

15

cooperatives in turn rely on their members to fulfill their long-term contractual commitments. The Seventh Circuit has recognized the importance of maintaining these mutual obligations, observing that "[t]he withdrawal of any distribution co-op from the system necessarily shifts the fixed costs of the electricity ... to the other members of its generation and transmission cooperative and raises the possibility of default, with potentially disastrous results for the system." Fuchs v. Rural Eelc. Convenience Cooperative, Inc., 858 F.2d 1210, 1212 n.8 (7th Cir. 1988) (citation omitted). Thus, the public clearly has an interest in ensuring that cooperative members uphold their contractual obligations.

### E. Security

Federal Rule of Civil Procedure 65(c) provides in relevant part that, "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. Pro. 65(c). Under Seventh Circuit law, because "the amount of the security rests within the discretion of the district judge, the matter of requiring a security in the first instance [is] recognized . . . as also resting within the discretion of the district judge." Scherr v. Volpe, 466 F.2d 1027, 1035 (7th Cir. 1972) (holding that the district court did not abuse its discretion in failing to require the plaintiffs to post a security when the plaintiffs showed a strong likelihood of success on the merits). Considering that Wabash Valley has made a strong showing that it is likely to succeed on the merits of its claims,

16

we find the posting of a nominal security to be sufficient in this case. Therefore, the Court hereby sets the bond payable by Wabash Valley at $5,000.00, ten percent surety.

### III. Conclusion

For the foregoing reasons, in the Court's view, equity is served by granting Wabash Valley's request for an injunction. It is therefore ORDERED, ADJUDGED, and DECREED that NREMC is enjoined from any disruptions, cessations or other such intentional interruptions in its continued purchases of all of its power requirements from Wabash Valley at the full FERC-filed rate during the pendency of this action or until further order of the Court.

IT IS SO ORDERED.

Date: 03/29/2012

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

John Michael Adragna
MILLER, BALIS & O'NEIL, P.C.
jadragna@mbolaw.com

Edward E. Beck
SAMBAUGH, KAST, BECK & WILLIAMS, LLP
eeb@skbw.com

John S. Bloom
SAMBAUGH, KAST, BECK & WILLIAMS, LLP
jsb@skbw.com

Randolph Lee Elliott
MILLER, BAILS & O'NEIL, P.C.
relliott@mbolaw.com

Jeremy Lee Fetty
PARR RICHEY OBREMSKEY FRANDSEN & PATTERSON LLP-Lebanon
jfetty@parrlaw.com

Lee A. Freeman Jr.
LEE A. FREEMAN, JR. & ASSOCIATES
Mrazek68@gmail.com

Randolph George Holt
PARR RICHEY OBREMSKEY FRANDSEN & PATTERSON LLP
r_holt@wvpa.com

John F. Kinney
JENNER & BLOCK LLP
jkinney@jenner.com

Peter C. Kissel
LAW OFFICES OF GKRSE
pckissel@GKRSE-law.com

Paul Sherman Kruse
PARR RICHEY OBREMSKEY FRANDSEN & PATTERSON LLP-Lebanon
pkruse@parrlaw.com

James T. Malysiak
JENNER & BLOCK LLP
jmalysiak@jenner.com

Don Fouts Morton
PARR RICHEY OBREMSKEY FRANDSEN & PATTERSON LLP-Lebanon
dmorton@parrlaw.com

Brian M. Simpson
SAMBAUGH, KAST, BECK & WILLIAMS, LLP
bsimpson@skbw.com